Thank you, Your Honor. May I please report Michael Wright again for the plaintiff appellant in the Constest Promotions v. City & County of San Francisco. This Buds No. 12-B-6 is before the District Court. Yes, Your Honor. Granted, finding as a matter of law, the allegations against David Wright. Yes, Your Honor. And again, I'd like to refer you to... Your Honor, I'm sorry. Five minutes or however much time I have. All right, Your Honor. I understand. I'll check and keep up. I'm sorry, Your Honor. I didn't mean to spend my time. I did have a question at the outset to make sure that I was understanding the relationship between what I'm calling Cases 2 and 3. The one that we've submitted on the briefs was a preliminary injunction appeal. But then there was a limited complaint, and the one that you're arguing now is the same case. But on final judgment, is that true? That's right. Okay. My last point is on the issue of whether the exemption in Article 6 for non-commercial signs violates the First Amendment. And under Central Hudson, if the speech regulation exempts a certain type of speech, that exemption must relate to the interest that the underlying restriction itself is designed to promote. Therefore, if the city exempts non-commercial signs, that exemption has to be relevant to safety and aesthetics, which is the city's interest in restricting signs in the first place. So the city has to have, in the words of the Discovery Network Court, some basis for distinguishing between a commercial sign and a non-commercial sign that is relevant to safety and aesthetics. And as this Court stated in Outdoor Systems, it's not enough just to say that commercial speech receives less protection under the First Amendment. As the Court said there, a city may not, in the interest of safety and aesthetics and safety, discriminate against commercial speech solely on the ground that it serves less protection than non-commercial speech. So where the city is in this case is where the city of Cincinnati was in the Discovery Network case. Because in Discovery Network, part of what the Court talked about was that it just really made no sense that there wasn't going to be enough of an impact of banning some of these news racks compared to others. It made no difference to the aesthetics of this whole thing. It was kind of for no reason at all. Why couldn't the city here say, we're not claiming that commercial signs are worse aesthetically, but it's really different than Discovery Network because there are more commercial signs than any other kind of sign, and that's an aesthetic issue, and so we're starting with commercial signs. Right. And the answer to that question is in the Medico-Minds case. In that case, the Los Angeles ban on off-site commercial signs eliminated the majority of off-site commercial signage. So unlike the ordinance in the Discovery Network, the one in Los Angeles was highly effective, and it exempted off-site signs at certain city-owned transit stops. And there, the Court required the city to show some basis for distinguishing between an off-site sign on city property and an off-site sign on private property, and the Court found such a distinction. The Court said that the signs on city property would be ordered, whereas the ones on private property would be spread willy-nilly around the city. So the point, though, is that Metroline cited Discovery Network's discussion about why there has to be some basis for distinguishing, and that case involved an effective ordinance, not one where the exemption essentially swallowed most of the signs, but there was only a marginal reduction. Counsel, I have a different question about that aspect of the case, because I understood the district court's opinion. The court was saying that, in fact, this ordinance, Article VI, does not actually draw a line between commercial and non-commercial, but it rather distinguishes among different types of commercial signs, much as we were discussing in the previous case. What is your response to that part of the court's analysis? It does both, and each of those distinctions has to stand on its own. The city cannot stand on its own. Why is that? Because if the city basically says, we're going to allow both commercial and non-commercial signs under the following conditions, but anybody who's commercial and doesn't meet those conditions can't use their sign. Why is that a separate thing rather than taking it as a package? One reason is that the support in outdoor systems didn't take it as a package. In outdoor systems, the sign codes that issue in that case distinguish between on-site and off-site commercial signs, and the court followed Metro Media and upheld that distinction. And then the court said, but this ordinance is neutral as between commercial and non-commercial signs, and therefore it does not run afoul of Discovery Network. Why is this also neutral in the sense that they meet those requirements? Because it burdens commercial signs simply because of their message, while it exempts entirely non-commercial signs for no other reason that they have a non-commercial message. Not their size, their height, or anything else that affects the visual environment, but simply because of their non-commercial message. And that's why it's not neutral. On page 611 of the outdoor systems case, and we quoted that in one of our briefs, the court says this ordinance does not run afoul of Discovery Network because it's neutral as between commercial and non-commercial. They use what's called a substitution clause. The city hasn't gone that way. Instead, they exempt... Isn't the effect of those two things exactly the same? So maybe I misunderstood outdoor systems, but I thought in outdoor systems the effect of the substitution clause was basically that a non-commercial sign could be on-site or outside. It doesn't matter. You're allowed to do whichever kind you want, and it was only the commercial signs that had the same restriction you guys have, that you've got to be on-site to be able to have your sign. Isn't that true? No, Your Honor. In San Francisco, there is a whole complicated set of regulations under Article VI that applies due to commercial. And then this is not a matter where the city says, oh, and if you want to, you can put up a non-commercial message at any one of these places. What the city is saying is we're going to exempt non-commercial signs, and we're going to differentially burden commercial signs. Right. But doesn't exempting non-commercial signs mean that non-commercial signs can basically be wherever? And so commercially, I thought your argument was commercial signs are being regulated more than non-commercial, which I thought was also true in outdoor systems. It is not true in outdoor systems, and the court on page 11 made that very clear. I know the court said that, but I didn't understand why. I mean, it's our court, but I don't understand how our court said in outdoor systems they're treated the same because the exemption meant that non-commercial had more liberty than commercial. Well, the court did treat the two distinctions, on-site versus off-site, within the commercial category, and commercial versus non-commercial. The court treated those two as separate because it said that the city could not discriminate against non-commercial speech simply because it was commercial, and that exemption does just that. For example, if someone wanted to go out and put up a sign in San Francisco, if it's a non-commercial sign, it doesn't need a permit. It doesn't need anything. It doesn't have to worry about size, height limitations, or anything. And the court in outdoor systems stressed that we regulate non-commercial signs and commercial signs the same, and then see off-site, see every network again. And so those are separate distinctions, and the trial court and the city have put those two together and say, well, if the on-site, off-site distinction flies, then the ordinance is okay, but that's not the way the Ninth Circuit has approached it, and that's not the way basic logic should approach it. The sign ordinance can have one valid distinction and another that's invalid, but what if the city said, well, we aren't going to allow natural persons to put up a sign. Only corporate entities can put up signs. Would the on-site, off-site distinction, however valid it may be, shield that? No. And so it doesn't shield this one either. And so what the city needs is what it doesn't have, and the city didn't have in the discovery network, and that is some basis for distinguishing a sign simply because it's not a sign from a non-commercial sign that relates to safety anesthetics, that materially advances that interest. The city has not. I have a completely different question. You also make an argument regarding joining the approval of penalties for noncompliance, and I have some procedural questions for you. As I understood it, there's some kind of procedure in state court that would have allowed a formal review, some sort of administrative process, following the denial of permission to correct the sign. Is that correct or incorrect? There is an administrative proceeding that you can follow, and there's a temporary stay of penalties during that proceeding. So did you follow that procedure? No, we came to federal court instead. Okay, but had you followed that procedure, there would have been a stay, correct? There would have been a stay up to a point only during the administrative proceedings. Once the administrative proceedings were concluded, once the administrative slowing appeal was over, then the penalty clause would restart. Did you seek a stay in this court? Yes, we did. We moved for preliminary injunction. Oh, I'm sorry. So did you seek a stay of the accrual of the penalties in this court? I did not see it on the draft. We haven't filed that motion at this time, in part because we're trying to see how the appeal of the dismissal of the Ex parte Young claim is treated. At this time, though, we have, the contest has removed additional signs, so I'd like to talk about Ex parte Young for a little bit. I see, as usual, I'm running down my time, but the point of Ex parte Young is that when a private party gets a threat from the government and that private party is willing to go to court and place before the judicial branch its case and say, I believe this statute is unconstitutional, it's invalid or doesn't apply, and here are my reasons. I'm submitting that to the court, not being a scofflaw and saying, come get me. We're coming to the court, and we do that promptly, as the court did and, I'm sorry, as the plaintiffs did in the Pacific Coast, U.S. v. Pacific Coast case that the city and the district courts seem to have ignored. And as in that kind of case, does the plaintiff have to stop its activities, shut down its business, or, and choose between that option and disobeying the order, defying the threat and risking prohibitive penalties? So does Ex parte Young just say that you can come to court and seek the injunction to stop the enforcement of the ordinance, which is what you did, and you're allowed to do that, and whether you choose to violate it in the meantime or not is your choice, but that's why you seek an emergency stay from our court if you think the enforcement and you think it needs to be enjoyed now so you can have your signs and you come to us and say, I mean, this is an emergency thing. Well, we are certainly prepared to do that. But you did, and it's that you just violated the ordinance. Well, what we did is we changed the copy on our signs. Some, but not others, right? Some. Well, in fact, I think now we've pretty much done them all. But the point is that, yes, we may have additional remedies we can pursue, but we do have a valid claim under, and the question here is, do we state a claim for relief under Ex parte Young, and I would say that we do because we meet the two criteria. We promptly sought relief, and we did it on reasonable grounds. I think the court would agree that whatever the views of the court. But going throughout your case because you weren't violating the ordinance or were violating the ordinance, you've got to proceed with your Ex parte Young action to enjoin enforcement of this ordinance, and that's what you're allowed to do and you've been doing it. So I don't understand how you're also blocking your signs under that. It seems like you were allowed to bring your case, which is what Ex parte Young talks about, bringing a case to enjoin enforcement. Well, in the Wadley and the Pacific Coast case, what the court said is you can bring your case, and if you satisfy the two criteria of Young, that's prominence and reasonableness, then you are not subject to penalties. Right, there are certain kinds of cases where you can figure out if you're violating or not without violating, but I don't think that's true here. You're bringing a facial challenge to this ordinance. And the case law does not require that a party be forced to commit a violation and defend the validity and challenge the validity of the penalty proceeding. The case law, and you see the Morales case, Pacific Coast, Wadley, those cases all say that the plaintiff can go into court and also get relief from the penalties, and that's what we've asked the district court to do, and the district court's throughout that claim. And so the issue before the court right now is not, is there something else we can do, and there probably is and we'll do it, but the issue before the court right now is, does our complaint on its face state a claim for due process violation under Acts 20-0? Now, I see I'm out of time. We are. You may ask for a moment of silence. Thank you. Good morning, Your Honor. Good morning. Deputy City Attorney Jim Emory again. This is a very bold case. The plaintiff seeks to invalidate San Francisco's entire sign regulations, and because of the commercial and non-commercial distinction, because of the exemption for non-commercial signs, the very exemption that both the state and federal courts have required San Francisco to do. So, Your Honor, I realize you're in an awkward position, because you've got the exemption for non-commercial because you think the courts required it, but they seem to be making an argument that I couldn't find any court having really addressed other than Discovery Network, which helps him. So, what is your best argument for the idea that you can treat commercial signs with more restriction when your reason for restricting signs at all has nothing to do with the difference between commercial and non-commercial? I look at Discovery Network itself. Discovery Network said that a municipality cannot restrict commercial signs solely because they enjoy less protection than non-commercial signs, and that solely is important. Okay, so how is the city doing something other than solely? Because, and if you look, again, at Discovery Network, the court says, we're making this decision only on the record we have us. Cincinnati has waived or abandoned any argument that commercial news racks have a propensity to proliferate any more than news racks containing non-commercial. Well, more proliferation just means there are more of them. So, is that your argument, that the reason the city can treat commercial differently than non-commercial is because there are more commercial signs? Because there are more commercial signs, and as a regulation, they will proliferate. There will be more and more and more because of the profit motive there. I have another question, which there seems to be an assumption. I may be missing something here, but I think you can read the exemptions as covering all non-commercial signs. Am I wrong about that? It seems to me that there were a lot of categories of non-commercial signs, but is there something more generic that I'm overlooking? There was an amendment to the ordinance in January of 2017, which explicitly implemented what the state and federal courts have required in the Metro Field case and in the Eller Outdoor case, which is very, very exactly correct, that for decades, the ordinance, if you look at it in black and white, said it exempted these particular categories, and then the case law said, well, since the city was exempting all these categories, when you add all these categories together, these categories essentially cover all non-commercial signs. I didn't take a part of what you mean, but now you have to. So, in order to preserve the constitutionality of the city's ordinance back then, the state court in Eller Outdoor and the federal court in Metro Field said we will interpret this laundry list of non-commercial categories to incorporate all non-commercial signs. And so, finally, the city in 2017, in January, explicitly amended the ordinance. So, now what the ordinance says is it inserted the little phrase at the beginning, all non-commercial signs including, and it maintains the list. So, now he's arguing something that seems sort of novel, that now that you've done that, you have another problem that's a new problem, which is that your reasons for regulating signs are aesthetics and safety, and there's no aesthetic or safety difference between a commercial sign and a non-commercial sign. So, am I right that your response to that is, well, we should be able to be under-inclusive and we're just doing commercial first or we're doing commercial because there are more of them or it's part of the solution? Is that basically your response? We're doing commercial because they will drill a frame. Which means there are more of them, right? Well, two things. There are a lot of them and there will be more of them. That they have a, that non-commercial signs have a value, this is a core political speech, that commercial signs don't. But that value is not related to aesthetics or safety, right? So, has the city said that part of what it wants to do is promote more non-commercial dialogue in the city or something? I mean, I didn't understand that to be at least one of the reasons given by the city for the ordinance. No, that's one of the reasons behind the LR outdoor and metro fuel cases and metro media to start with. That the problem with seeing Diego's sign ordinance and metro media was because of the same restrictions on non-commercial content that apply to non-commercial signs. It is metro media that is leading and requiring this distinction between commercial and non-commercial signs, I guess. To circle back to your question. So, part of your response is that the premise is wrong, though. I mean, so he says your only interests are aesthetics and safety. And you're saying that's not true, our interests are aesthetics and safety. And I think the courts have said that. But underlying that, we also are interested in having a dialogue in San Francisco about other things other than commercial speech. Yeah, we are interested in doing that. And because of the landscape of the First Amendment law, we are tackling safety and aesthetics where we can. The problem under inclusiveness, I read Metro points again last night, and it talked a lot about the Norlees case, East Pink Court, and it made a lot of sense to me that the problem with under-inclusiveness in the Norlees case, and in that case, there was a prohibition against advertising of casinos and gambling, but it exempted Native American casinos from the prohibition. And the under-inclusiveness was because, once for one, a gambler, if not going to a private casino, was just going to move and there was going to be no reduction at all, no net reduction in gambling, which was the purpose of the law in that case. Here, because we have the legislative findings of proliferation, the city has satisfied central Hudson's requirement for restriction of commercial speech by having less than a one-for-one sort of substitution that the Norlees case said was not sufficient. For every commercial site the city regulates, there's not going to be a non-commercial site that pops up, and instead, the non-commercial sites, and dialogue is happening on its own terms. If the city can regulate the commercial sites as it is entitled to, it will be promoting its interests and safety and aesthetics. Yes, it does seem to me right that if you look at one commercial site and one non-commercial site, they will have the same impact and safety and aesthetics, but we're talking numbers here, and the city's entitled to do that. Chamute expertea, one of the requirements of expertea that the plaintiff agrees with is they must move promptly. The simplest reason to reject the expertea claim here is this bold claim that the entire site regulation is invalid was legally available in 2009 when it came to the tax promotions for the city, saying that 602.3 was unconstitutional. Instead, conscience-prompting waited until it was prosecuted. It waited until San Francisco issued a notice of violation in the fall of 2016, and the district waited seven years to bring this novel theory to the courts. So that's the threshold for expertea, a requirement that does not meet here. Is there anything about the ordinance or the city's enforcement that would have prevented them from challenging this ordinance on its face without simultaneously violating it? And getting fined? Well, absolutely. They have done that. No, I know they have done that, but did it have to do that? So you passed the ordinance. They're a signed company. It's very clear their signs would violate it. Could they have come to federal court and said, we have a First Amendment challenge to this ordinance. It's had to go into effect. We'd like to have an emergency TRO and preliminary judgment against this ordinance. Could they have done that without violating and getting a fine? They could have done that, but I'm looking at it from another perspective as well, that this is a permit requirement, and people aren't operating without the permit before they get the permit. This is not a requirement for an ongoing business. In the Settlement Agreement, which refers to the authority, because of our degrees, we're going to start from scratch. We're going to seek new permits for each sign. And so the city was able to evaluate each permit application and deciding whether or not, if you apply ex parte to these permit application procedures, I think there's no basis for it now. You can't just do business without a permit where a permit is required. If you get a permit that's been rejected and you think it hasn't been rejected, then you go to court. And if at the end of the day the city was invalidly rejecting the permit, was improperly rejecting the permit, then maybe there's damages. Maybe there was a taking of a vested right. Maybe there's attorneys faced. But all those remedies are available. There's no irreparable harm that would justify the ex parte relief in a context of a permit application here. Have they pediated the fines in the meantime? No. In fact, no fines issued. They seem to think that their clue is based on the fact that they have not paid fines in the meantime. I'm curious about that. Well, they complain that they have been faced with a choice of accruing fines or removing the unauthorized content. So what? I see. So if they win this lawsuit, if we say this ordinance is unconstitutional, they're never going to owe any fines, right? Correct. And they will put up their signs that the city has denied permits for. And maybe they'll have an argument that the city's liable for damages to them if the permits were improperly denied. And that's remedying the sense of safety. In other words, they are lost profits from whatever it was denied. Right. The lost profits, or if they can establish a vested right, which I don't think they can, that would be the argument. But, again, the simplest disposition of ex parte. They wait eight years. Well, it seems to be that, given what you've said, that there have been no fines levied, it seems to be that we might have a jurisdictional problem or maybe a standing problem of some sort, that they're arguing about something that doesn't exist. Well, they are arguing about having to make that choice. They're saying it's unfair to have to change the copy, to not be getting that revenue from the video game company. That is the argument. That's not the way it's framed. It's framed as enjoining the criminal penalties. I'm sorry. If there are no further questions, the city will suspend. I don't believe there are. Thank you. Mr. Wright. Thank you. With respect to the commercial-noncommercial distinction, the city claims, oh, well, we had to do that because the courts required us to. But the issue the courts were addressing was whether the city could distinguish among categories with noncommercial speech, exempting, say, a certain kind of government side, but not other types of noncommercial speech. And the media plurality said, you can't do that. But that's a different issue, distinguishing among categories. Noncommercial speech is a very different issue from distinguishing between all commercial on one side and all noncommercial on the other. That's what the city did in discovery network, and that's what the city has done here. But our court has looked at regulations separately and applied a lower level of scrutiny to commercial. It's actually a noncommercial. To commercial, the noncommercial, a higher level of scrutiny to the political speech. So there's a reason why they think they have to do this. You might think they're wrong, but it's not that they made it up. Oh, no, they think they made it up, but there is a reason, and the reason is that commercial speech can lead to commercial harms like fraud, false advertising, overreaching, other unfair types of business conditions. Noncommercial speech can't do that. But safety anesthetics has nothing to do with creating that, what Justice Stevens called that fair bargaining process in 44th Liquor Market. Safety anesthetics is about exactly that. But he just said that's not our only concern. We'd actually like to have dialogue on noncommercial topics. You know, I think what the city is doing here is arguing a whole lot of facts in a world where we're entitled to have the allegations of the complaint taken as true. Well, but we were looking at legislation in general. When you apply a principle, we looked not only to what a legislating body actually said about its reasons for enacting something, but also oftentimes there's no standard. What could the legislature have been thinking? That's how we analyze legislation generally. It's not a factual question in the normal sense of pleading or not pleading. The city so far, until they got up to this lectern, has never said the purpose of commercial and noncommercial distinction is to foster greater noncommercial dialogue in the city of San Francisco. Well, they have never said that. Can we still conclude that based on the way that we've analyzed legislative purpose in many kinds of constitutional cases when we're looking, for example, at a rational basis test? Well, A, we're in a higher level. It doesn't matter. It can be strict scrutiny. My point being that nobody has to say, either at the legislative level or at the lectern, what the reason is. Don't we ascribe to the legislative body the best reasons we can think of for why they did what they did? That's what we do in our annual analysis. No? In fact, this is one of the differences between heightened scrutiny, or intermediate scrutiny, and rational basis. The courts will not substitute any purpose that the city hasn't clearly articulated. There is nothing in the text of the ordinances that I've studied. I've studied Article VI pretty closely. There's nothing in Section 603 or any of the other provisions that issue here that says anything about any interest other than questions that things boil down to safety and aesthetics, such as property values. In your view, that's all we can look at is the face of Article VI. See, at least at this point, because the court, in intermediate or strict scrutiny, doesn't invent reasons. I don't mean that in any kind of pejorative sense, but the court could invent reasons on a rational basis. That happens. Could a reasonable legislature do this? You don't do that under central Hudson or strict scrutiny. So I also want to. Your time on minutes has expired. Good. Can I add one minute on expiration? I thank you. We understand your position, Your Honor. Okay. Thank you, Your Honor. Thank you. Each time I went over, and I appreciate the time. Thank you. The case just argued is submitted, and we appreciate the very interesting arguments from both panels. If you find it useful to our deliberations. And our final case on this morning's argument, The case just argued is expression versus speaker.
judges: Graber, Friedland, Marshall